Summerbell v. Summerbell.

JOSEPH J. SUMMERBELL, appellant,

v.

MARTHA A. SUMMERBELL, respondent.

A confession of adultery written by the wife in the presence of and under the eye of the husband, is presumed to be procured by his coercion, and is not a safe basis upon which to build up and support a charge of adultery against the wife.

On appeal from a decree refusing complainant a divorce and dismissing his bill, advised by Barker Gummere, Esq., whose opinion is as follows:

The parties in this cause resided at Milford, in the county of Hunterdon, in this state, at the time of the filing of this bill, and their marriage is proved.

The complainant charges in his bill of complaint that the defendant committed adultery with Dr. John H. Helm, of Peru, Indiana, in the months of July, August, September and October, in the year 1877; and that she also committed adultery with one George I. Reed, her brother-in-law, at Madison, Indiana, in the month of September, in the same year; and at Peru, Indiana, and at Toledo, Ohio, in the months of September, October and November, in the same year, and prays a divorce a vinculo.

The answer denies the charges of the bill, and the suit is vigorously contested by the defendant.

In support of the charges of adultery set forth in the bill, the complainant has produced in evidence three writings signed by the defendant on September 10th, 1878, but each dated September 7th, 1878.

The first writing states that the defendant had been solicited to commit adultery by one Dr. Parsons, one A. A. Hollembeak and one G. D. King, but had refused them; and that she had per-

mitted one T. C. Phillips to put his arm around her and kiss her a few times, but had never committed adultery with him.

The *second* writing states that she committed adultery with Dr Helm, who was her medical attendant at the time, on one occasion, after the doctor had been "doctoring" her, and after that occasion the criminal act was several times repeated.

The *third* writing states that the defendant committed adultery with Mr. Reed, for the first time, when he took her to an editorial convention (which, as appears from the testimony in the cause, was held at Madison, Indiana, in September, 1877), and that after that the criminal act was several times repeated in various rooms in Mr. Reed's house at Peru, Indiana (where the defendant was then visiting and sojourning), and on another occasion "at the hotel," which hotel is identified by the testimony in the cause as being the Boody House, in Toledo, Ohio, and the occasion is identified as a journey of the defendant on her return from Peru, Indiana, to her husband's home in New Jersey, escorted by Mr. Reed from Peru to Toledo.

Although these writings are formally separate, yet they were all executed by the defendant at one and the same time, and together constitute one "confession" of guilty conduct.

The circumstances under which the confession was made are detailed by the subscribing witness, Miss Caroline Forman.

The complainant had informed her several days before September 10th, 1877, that he should call on her to witness some papers. On the morning of September 10th, she went to his house and was met by him in the hall, at the foot of the stairs, and informed by him that she was needed as a witness. He then conducted her to his study on the second floor, and the defendant entered the room at about the same time, and saying she was glad to see her, seated herself at the table and began to write upon the papers called "the confession," copying from another paper held in her hand, and signing her name to each writing; that the writings were then passed to the witness, who subjoined with her own hand the attestation clause now appearing upon each, copying said clauses from a form in the handwriting of the complainant, and signed her name to such as a witness; that the

complainant took the writings when thus completed; that the witness was not informed and knew nothing of their contents; that the witness and defendant then went down stairs into the parlor, and after some conversation on indifferent subjects the witness left the house.

The contract of marriage is tripartite, the husband, the wife and the state being the parties thereto; and it can neither be entered into nor dissolved except by the consent of and in the manner prescribed by the state. It necessarily follows that no admissions by either party to the contract, however conclusive upon such party, can be conclusive upon the state in a suit for the dissolution of the contract, and that such dissolution cannot safely be decreed unless the admission be corroborated by strong proofs. From an early day such has been the rule of the common law. In England, the one hundred and fifth canon of 1603 prescribed, among other things, " that credit be not given to the sole confession of the parties themselves, however taken upon oath, either within or without the court." The canon obviously leaves to a confession some weight as evidence, but what that weight should be is left curiously in doubt by the English cases. Thus in *Williams* v. *Williams, 1 Hagg. 299,* Lord Stowell says that a confession is a species of evidence which, though not inadmissible, is to be regarded with great distrust, while in *Mortimer* v. *Mortimer, 2 Hagg. 310,* the same learned judge announces that a confession ranks high, " I should say highest in the scale of evidence," though in the same case he admits that the rule that confessions alone will not support a charge of adultery, is too firmly established to be shaken.

In *Harris* v. *Harris, 2 Hagg. 376,* Dr. Lushington is more intelligible when he says that a confession perfectly free from all taint of collusion, when confirmed by circumstances and conduct, ranks among the highest species of evidence. These impressions, though from such weighty sources, are unsatisfactory. It is difficult to conceive that a species of evidence which the canon stamps as insufficient, which one learned judge regards with distrust, and another equally learned judge requires to be confirmed by circumstances and conduct, can rank high as evi-

dence, logically—evidence that is insufficient to sustain a decree which, standing alone, is to be distrusted, and which is of weight only when corroborated by circumstances and conduct appearing from other testimony in the cause, must rank low in the scale of evidence.

The facts and circumstances of the cases throw the best light upon the meaning of the learned judges. In *Williams* v. *Williams,* the confession was contained in a letter from the alleged adulteress to her sister, and there was proof *aliunde* that she frequently visited her alleged paramour and was with him alone at his lodgings, yet a divorce was refused. In *Mortimer* v. *Mortimer,* the confession was made by the alleged adulteress when *in articulo mortis,* as she supposed, both to her husband and her sister-in-law, and was set forth in the husband's complaint, which was excepted to on the ground that the confession alone was insufficient, and that no other acts or facts were averred which were sufficient to sustain it, and the exception was sustained. In *Harris* v. *Harris,* it was proved that the wife had conducted herself with general levity, had been very attentive to her alleged paramour and jealous of his attentions to other women, and on the occasion of a picnic party had persuaded another lady to separate themselves from the party and go into a wood, and that on arriving in the wood the wife " whooped " until the paramour joined them; her companion, who was gathering flowers, observing the pair reclining on a bank, he with his arm around her waist, called to the wife to come away, and upon her refusing to do so, she left the pair in that position. Subsequently, upon being told by a friend of her husband that the paramour had admitted that he, on that occasion, had sexual intercourse with her, she did not deny it, but exclaimed " he is a dirty scoundrel," and then said she knew it was impossible to live with her husband after what had happened, and that she would leave his house if promised that there should be no further investigation of her conduct. The entire absence of other proof than the confession in *Mortimer* v. *Mortimer;* the absence of any proof of personal familiarities or of indications of illicit affection in *Williams* v. *Williams,* although imprudent conduct and abundant

opportunities were clearly proved, and the presence of proof in *Harris* v. *Harris* of illicit affection, of rendezvous, and of familiarities, position of parties, and circumstances leading to the very brink of the adulteries, sufficiently indicate the reasons for the *status* assigned to the confessions in the respective causes.

So, also, in *Burgess* v. *Burgess, 2 Hagg. 223,* the wife confessed her adultery to her husband, and afterwards admitted to a third person that she had so confessed, the proof *aliunde* was that her paramour, an inmate of her husband's house, paid her constant attentions; that she desired his attentions and always wanted to sit next to him; that he sat so close to her as almost to be in her lap; that they took every opportunity to be alone together; that when on a fishing party they went off together to a spot a half mile distant from the party; that when both were visiting a friend, she was seen coming out of her paramour's chamber, in which he was then present; that both left the drawing-room and were absent about an hour, and on their return that both were flurried and a good deal heated. The confession was deemed to be sufficiently supported and a divorce was decreed.

In *Noverre* v. *Noverre, 1 Rob. 428,* the wife confessed her adultery to two persons other than her husband, and the proof *aliunde* was that the husband (a surgeon) left his house daily early in the morning, and was absent, generally, until evening; that the paramour, a pupil of the husband and an inmate of his house, sought the wife as soon as the husband left the house, and spent the time of his absence in her company in the drawing-room, walking in the garden, and sitting in the arbor, and that when the husband's return was announced they immediately separated; that she was often in the bedroom of her paramour, when he was there, sometimes for ten minutes at a time; that the wife and paramour retired for the night much earlier than the husband, who sat up to a late hour; and that the wife often came out of her room in her dressing-gown and stood on the stairs talking to the paramour until the servants went to bed, passing them and leaving them standing on the stairs, and that they behaved like lovers. The court held that extreme famili-

arity and ample opportunity being proved, and being convinced that the confessions were genuine, the spirit of the canon was not violated by pronouncing for a divorce.

So, also, in *Owen* v. *Owen, 4 Hagg. 261,* the wife confessed her adultery in letters to a person other than her husband, and the proof *aliunde* was of great intimacy with the paramour; that on one occasion he passed the night at her house, while her husband was absent; that on two other occasions she was absent from her husband's house all night, and refused to say where she had been, although proved not to have been at the house of the friend to which she had said she was going; and that she had tried to suborn witnesses to testify that on those occasions she slept where no suspicion could attach to her. The court held that there was no collusion in the confessions, and as there was sufficient evidence to corroborate them, a divorce should be ordered.

In *Grant* v. *Grant, 2 Curteis 16,* the confessions of the wife's adultery were contained in her letters to her paramour, and the proof *aliunde* was that there was great intimacy between them; and on one occasion improper personal liberties on his part; and that on another occasion he passed the night at her house during the absence of her husband; and that this visit was concealed from the husband. The court held that the letters were sufficiently corroborated, and a divorce was decreed.

In *Tucker* v. *Tucker, 11 Jur. 893,* the confession of the wife's adultery was contained in a letter from the wife to the husband's father; and the proof *aliunde* was that after her husband sent her from his house, she went with her alleged paramour to a distant city, and there took lodgings and passed the night; there was no proof of improper intimacy between them before the confession. The court, without adverting to the corroborating circumstances subsequent to the confession, decreed a divorce seemingly upon the sole ground that the confession was not collusive. This ruling, if so intended, is certainly a relaxation of the rule theretofore enforced, but it does not seem to have been followed in subsequent cases.

Thus in *Deane* v. *Deane, 12 Jur. 63,* the wife, while on a visit to a friend, left her house and went to the house of a young

unmarried officer, and stayed there with him for a fortnight, refusing to leave him when requested to do so by her friend. Subsequently she wrote to her husband expressing her remorse for her guilty conduct, and though the confession was plainly free from collusion, yet the divorce was decreed, not upon the confession alone, but upon the whole testimony.

And in *Shuldham's Divorce, 12 Cl. & Fin. 363*, a letter from the wife to the husband, confessing adultery, was held not to be sufficient evidence of adultery, but upon a commission being issued, it was further proved that the wife had been very intimate with the paramour in India, that she went with some friends, with her husband's consent, to the Cape of Good Hope, was soon joined there by her paramour, and after a time returned with him to India, and there lived with him and gave birth to a child more than a year after leaving her husband, and thereupon a divorce was decreed.

It is clear, therefore, that up to the time of the institution of the matrimonial court, no divorce was, in fact, granted in England solely upon the unsupported confession of the criminated party, adjudged by the court to have been made without collusion. Although Dr. Lushington, in his later decisions, was inclined to magnify the importance of apparently non-collusive confessions, yet in *Noverre* v. *Noverre*, he clearly states the fundamental difficulty in these words : " No tribunal is to be trusted with the power to determine that which is impossible, namely, whether such a confession be genuine or not."

There are cases in the United States which seem to adjudge that a divorce may be decreed upon the confession alone, if the court be satisfied from surrounding circumstances that it was made without collusion. *Tewksbury* v. *Tewksbury, 4 How. (Miss.) 109 ; Matchin* v. *Matchin, 6 Pa. St. 332.* But it is to be noted that in both of these cases there was, in fact, strong corroborative proof of the fact of adultery. The only case that I have found, in which a divorce has been granted solely upon a confession adjudged to have been made without collusion, is *Billings* v. *Billings, 11 Pick. 461.*

In our state the rigidity of the rule seems not to have been

39

relaxed.    The confession of the criminated party has been uniformly required to be supported by proof of the fact of adultery; and our courts have treated confessions as objects of suspicion. Thus, in *Clutch* v. *Clutch, Sax. 474,* the following language is used : " In cases of this kind the court takes the confessions of parties with very great caution, and they are never held sufficient without strong corroborating circumstances."    In *Miller* v. *Miller, 1 Gr. Ch. 139 :* " These admissions are not to be received as a general rule with much faith; they are competent when connected with other proof, but not without.    The reason assigned is, that there is great danger of collusion between the parties, or of confessions being extorted."    And in *Jones* v. *Jones, 2 C. E. Gr. 351,* the present chief-justice, sitting as master, observes : " Indeed the approved rule of law appears to be, that a divorce will not be granted when the admissions of the criminated' party constitute the entire basis upon which to rest the conclusion of guilt.    Such evidence, it is said, may convince to a moral certainty ; but it does not fill the measure of legal proof "    To these authoritative deliverances, must be added the well-considered words of Chancellor Kent.    He says, in *Betts* v. *Betts, 1 Johns. Ch. 197 :* " The party's confession may and does aid other proofs, but the decree must not rest alone, nor perhaps, essentially, on such confessions ; for there is great danger of collusion between the parties, or of confessions extorted, or made designedly to furnish means of evidence."    These confessions, therefore, are to be received in this case with jealousy, and to be weighed with caution, and to be supported with facts and circumstances tending to demonstrate the charge to the satisfaction of the court.

It is apparent that a confession, to be entitled to any material weight as evidence of adultery, must not only be shown to be free from collusion, but, when made by the wife, must also be shown to have been made freely, without compulsion or undue influence on the part of the husband, and it must also appear that the husband has not caused it to be prepared as a means of formal proof.

I take the rule to be that, if the proofs in a cause irrespective of the confession of the criminated party, well nigh demonstrate

the fact of the adultery charged, but do not entirely satisfy the conscience of the court, the confession may then (if free from suspicion of collusion or duress, or improper influence, or of having been prepared to furnish evidence) be permitted to decide the otherwise doubtful judgment of the court.   In applying this rule to the present case, I have concluded that the confessions of the defendant are entitled to little weight.   They do not appear to be collusive.   The subsequent letters and conduct of the defendant go far to repel any suspicion on this ground, but the circumstances attending the making of the confessions are suspicious. They were apparently in course of preparation for several days, at the husband's house, and the attesting witness was notified by him, several days before their execution, that her attendance would be required.   They were signed by the defendant in her husband's presence and under his eye.   The endorsement upon each of the papers was copied by the defendant from a paper couched in terms evidently intended to rebut what the husband felt would be a most natural inference under the circumstances, to wit, that he had extorted the confessions or procured them by undue influence, and the careful preparation for, and the execution of the formal attestation of each paper by the subscribing witness, copying from a form prepared by the complainant, indicate clearly that the complainant procured them as a means of evidence.   It seems certain that the complainant procured these confessions and that they were designed, by these guarded formalities, to furnish means of proving his wife's alleged adultery, and that in this respect the confessions are within the ruling in *Betts* v. *Betts.*   These papers emanate directly from the parties to the suit.   They are deliberately prepared in the seclusion of the family, and even when executed their contents are concealed from the attesting witness.   How they were procured, what motive or influences operated upon the defendant, what inducements were held out, are secrets known only to the parties, and which the law of evidence shuts out from the knowledge of the court.

All that I can know of them is, that they were prepared with the husband's knowledge, that they were executed under his eye, and that they were prepared to be used, as they have been used,

as the means of proving the wife's adultery. I regard such a confession as the object of a just suspicion, and as surrounded with highly suspicious accompaniments. The burden is on the complainant to prove that the confessions of the defendant were voluntarily and freely made, and there is certainly no evidence tending to show that fact—the legal presumption is to the contrary.

I must look, therefore, to the other proofs to determine whether the adulterous acts charged upon the defendant in the bill are satisfactorily maintained.

The first charge stated in the bill is that the defendant committed adultery with Dr. Helm in the months of July, August, September and October, in the year 1877, at Peru, in the state of Indiana. It appears from the testimony in the cause, that the health of the defendant had been delicate since the birth of her child in 1873; that after the birth a weakness of the generative organs supervened, which culminated in chronic inflammation of the neck of the uterus; that the disease continued to some extent until the year 1877; that in 1877, she visited her sister, Mrs. Margaret B. Reed, at Peru, Indiana, taking her child with her; that in April, 1877, Dr. Helm was called to attend the child, and on that occasion was introduced to the defendant by Mrs. Reed; that while attending the child Dr. Helm was consulted by the defendant as to her own state of health, and upon examination, he found her to be affected with inflammation of the vagina and urethra and displacement of the uterus; that he attended her twice on this occasion; that she then left Peru, and that he next attended her on her return to that place in the latter part of July, and continued to attend her until sometime in November, except when she was absent from Peru, making his visits once in five days during the menstrual interval; that his treatment consisted of the applications of powerful solutions of iodine and carbolic acid with glycerine until the inflammation had been reduced, and then applying a pessary to be worn by the patient and intended, by constant pressure upon the uterus, to restore it to its normal position; that his professional services were rendered to the defendant gratuitously, she being the wife

of a clergyman, in conformity to an obligatory professional rule; that Dr. Helm was of opinion that the defendant should abstain from sexual intercourse with her husband until her cure should be completed, and that as a delicate way of advising her to that course, he sent her the work of a medical author upon such diseases, just before her departure from Peru for her home, and desired her to read a paragraph he had marked, and which paragraph advised abstention from sexual intercourse during the continuance of such complaints.

There is no evidence that the doctor's visits were at unusual hours, of unusual duration or of undue frequency. There is no evidence of any but professional visits to her on his part, or of any marks of affection or intimacy between them. So far as the evidence shows, the only relation between them was that of physician and patient. It was contended by the counsel of the complainant that the act of the doctor in sending to the defendant the medical publication above mentioned, was so grossly indelicate as to justify the inference of improper relations between them; that the doctor has exaggerated the severity of the defendant's disease; that his accounts of his treatment of it are inconsistent with her frequent excursions, and particularly that his testimony is suspicious, in that he attempts to show that the act of sexual connection would have been unpleasant to her and difficult, if not impossible, on his part. I do not think his testimony is obnoxious to these criticisms; it is clear from the whole testimony that the health of the defendant was seriously impaired, both before and during her visit to Peru; it is equally clear that disorder of the sexual organs was the cause of her ill-health, and that such disorder was considerable. I think the doctor's account of the extent of the disease and of his treatment of it is entirely credible, and is not inconsistent in its details, nor contradicted by surrounding circumstances; nor do I think his mode of advising her as to abstention from sexual intercourse with her husband, at all suspicious, nor can I see anything in the proofs to justify the inference that, early in November, 1877, he was anxious to bring about a meeting and sexual intercourse between the defendant and complainant, in order to hide the

effects of his own previous adultery with her. Such anxiety is not consistent with his advice to her late in the same month, on the eve of her departure to her home, to abstain from sexual commerce with her husband ; if the charges of the bill were true, of acts of adultery in November, the doctor would hardly have given this advice.

In my opinion there are no proofs in the cause, *dehors* the confession, tending to criminate Dr. Helm ; and I hold that this charge is not sustained. The positive denial of the charge, though unnecessary, is conclusive.

The remaining charge stated in the bill is that the defendant committed adultery with her brother-in law, George I. Reed, editor of the Peru "Republican," at Madison, Indiana, in September, 1877 ; and in September, October and November, in the same year, at Peru, Indiana, at Toledo, Ohio, and at other places in Indiana and Ohio.

The complainant has not attempted, *dehors* the confession, to prove any acts of adultery by the defendant with Reed, except at Madison, in the month of September, 1877, and at Toledo, in the month of November, in the same year; hence, the inquiry is limited to the sufficiency of the testimony to prove the alleged adulterous acts on those occasions.

The defendant, as before stated, was visiting her relatives in Indiana, during the months above mentioned, staying part of the time with her brother at Kokomo, Indiana, and a part of the time with her sister, Mrs. Reed, at Peru. As to the alleged adultery at Madison, it appears, from the testimony, that while the defendant was staying at Kokomo, Mr. and Mrs. Reed were invited to attend an editorial convention at Madison, Indiana, and that Mrs. Reed, who had intended to accompany her husband to that convention, was taken sick a day or two before the time of starting and was unable to go ; that she or her husband, Mr. Reed, or both of them, then wrote to the defendant, inviting her to accompany Mr. Reed ; that her brother and his wife advised her to go ; and that her brother's wife lent her a traveling dress for the journey. That the defendant, leaving her clothes at Kokomo, went to the house of her sister, Mrs. Reed, at Peru,

and proceeded thence to the editorial convention at Madison, under the escort of Mr. Reed; that they were absent some three or four days, and that on their return the defendant stopped at Kokomo, and went to her brother's house, and that Mr. Reed continued his journey to Peru. There is no evidence of any prior illicit affection or improper intimacy between the defendant and Mr. Reed, nor of any contrivance between them, or on the part of either, to bring about this excursion, or of any improper conduct between them during the excursion, or of any opportunity for sexual intercourse.

I hold that the charge that the defendant committed adultery with Mr. Reed, at Madison, is not supported by any evidence other than that of the confession.

As to the alleged act of adultery at Toledo, it appears that while the defendant, together with Mrs. Reed, was staying at the house of her brother at Kokomo, in the latter part of November, 1877, she received a letter from the complainant, which caused her many tears and much nervous agitation, and that she said she must go home at once to her husband, then living at Milford, in this state; that her brother furnished her with money for her journey home; that he was unable to leave his home, but sent word to Mr. Reed, at Peru, to accompany the defendant on her journey homeward, as far as Toledo; that Mrs. Reed accompanied the defendant to her own house at Peru, and requested Mr. Reed to escort the defendant as far as Toledo; that the defendant desired to start from Peru immediately; that Mr. Reed was unable then to leave Peru, but was willing to go with her if she would wait until the next day, which she concluded to do; that the defendant was so nervous that night that she slept with her sister, Mrs. Reed, the husband going to another room; that her condition was such, and she expressed such distaste for stopping at a hotel in Toledo, that Mrs. Reed requested Mr. Reed to procure a room as nearly adjoining the defendant's room as he could; that Mr. Reed and the defendant proceeded to Toledo, which appears to have been a necessary halting-place, and arrived in the "Boody House" in Toledo, after ten o'clock in the evening; that Mr. Reed applied to the clerk of the hotel

for rooms adjoining each other, or communicating with each other, and entered on the registry of the hotel either "G. I. Reed and sister," or "G. I. Reed and sister, Mrs. Summerbell;" that they were assigned to two rooms, designated as 124, consisting of an outer room, with an entrance from the hall, and containing a bed and the usual bedroom furniture, and of an adjoining smaller room, having no entrance except by a door opening from the outer room, and also containing a bed and the usual bedroom furniture; that Mr. Reed and the defendant were conducted to these rooms and occupied them during the night of November 28th, 1877; that on the next day after dinner the defendant proceeded on her journey home, *via* the Pennsylvania railroad train which left Toledo at two o'clock P. M., and that Mr. Reed returned home. The complainant contends that the occupying of these rooms by Mr. Reed and the defendant is strong corroborative proof of the fact of adultery.

In determining the weight of this evidence, it is to be noted that there is no proof of any antecedent illicit affection, undue intimacy or undue familiarities between these parties; that the journey was not contrived between the parties; that Mr. Reed did not volunteer to escort the defendant, but was requested to do so by a message from her brother and a further request from the defendant's sister, his own wife, and that he declined to accompany the defendant unless she postponed her departure until the next day; that the defendant was in a nervous condition, and that Mrs. Reed had requested Mr. Reed to procure a room as nearly adjoining that of the defendant as he could. Under these accompaniments I do not think that the occupancy of these rooms by Mr. Reed and the defendant raises more than the slightest suspicion of adulterous intercourse between them.

All that can be said is, that if they had been inclined to commit adultery, the opportunity for the act had been afforded them.

But this is not sufficient; not only the opportunity for the crime, but also the will to commit, must be established. *Berckmans* v. *Berckmans, 1 C. E. Gr. 122; Black* v. *Black, 3 Stew. Eq. 228.*

In this case there are no circumstances whatever to justify the inference, or even the suspicion, that the parties had any lascivious inclinations to each other. The nervous distress of the defendant seems to have been great, and it is improbable that while in such condition she would have been animated by illicit passion. Nor do I think the circumstances of their occupying these two rooms, aided by Mr. Reed's registering Mrs. Summerbell as his sister, inconsistent with their innocence. It is as probable that each of them occupied separate rooms and beds as that both occupied the same. And in such case that interpretation will be adopted which is consistent with innocence. *Mount* v. *Mount, 2 Mc-Cart. 162; Berckmans* v. *Berckmans, 1 C. E. Gr. 122.* In my opinion the parties were imprudent, but there is no evidence and hardly a suspicion of their guilt.

Even if the circumstances had been more suspicious than they seem to me, as to the alleged acts of adultery with Mr. Reed, both at Madison and at Toledo, yet I think the testimony of Mr. Reed sufficient to remove all suspicion. He is shown to be a man of standing and respectability. His testimony is clear and straightforward, and he emphatically testifies to his innocence. Although criminated by the charges of the bill, yet the mere charge does not materially discredit him. *Berckmans* v. *Berckmans, 2 C. E. Gr. 453.* And in the absence of clear proof to the contrary, his testimony is conclusive of his innocence. *Mayer* v. *Mayer, 6 C. E. Gr. 246.*

In conclusion, I am of opinion that the confession in this case was not collusive, but that it was procured by the complainant to be used as evidence of his wife's adultery, and that it is open to the legal presumption of having been procured by the influence of the complainant exerted over his wife for that purpose, and that for both of these reasons it is insufficient to prove the facts of adultery charged; and I am further of opinion that the other evidence in the cause does not furnish sufficient corroborative proofs of the fact of adultery. The acts of adultery charged, or any of them, are not proved to my satisfaction beyond a reasonable doubt, and in such case our courts have wisely determined that a divorce should be refused. *Berckmans* v. *Berckmans, 2*

C. E. Gr. 453; Marsh v. Marsh, 1 Stew. Eq. 196. I respect-
fully advise the chancellor that the complainant's bill be dis-
missed, with costs.

Mr. E. C. Harris and Mr. John P. Stockton, Atty·Gen., for
appellant, cited—

Robinson v. Robinson, 1 Sw. & Tr. 363; Williams v. Williams,
L. R. (1 P. & D.) 31; Baker v. Baker, 13 Cal. 87; Conant v.
Conant, 10 Cal. 254; Sawyer v. Sawyer, Walk. Ch. 52; Har-
ris v. Harris, 2 Hagg. 376; Matchin v. Matchin, 6 Pa. St.
332; Troyman v. Troyman, 27 Miss. 383; Billings v. Billings,
11 Pick. 461; Herman v. McLean, 16 La. 24.

Mr. M. Beasley, Jr., and Mr. W. D. Holt, for defendant.

The opinion of the court was delivered by

VAN SYCKEL, J.

The complainant charges in his bill of complaint that the de-
fendant committed adultery with Dr. Helm, of Peru, Indiana,
in the year 1877, and also with her brother-in-law, Reed, at
Madison, Indiana, and at Peru and Toledo, in the same state, in
the year 1877, and he therefore prays a divorce a vinculo. In
support of the charges of adultery the complainant has pro-
duced the written confessions of the wife.

The master who advised the decree below concisely states, as
follows, the circumstances under which the confession was made,
as detailed by the subscribing witness, Miss Caroline Forman :

"The complainant had informed her several days before September 10th,
1878, that he should call on her to witness some papers. On the morning of
S·ptember 10th she went to his house and was met by him in the hall at the
foot of the stairs, and informed by him that she was needed as a witness. He
then conducted her to his study on the second floor, and the defendant entered
the room at about the same time, and saying that she was glad to see her,
seated herself at the table and began to write upon the papers called 'the
confession,' copying from another paper held in her hand, and signing her
name to each writing; that the writings were then passed to the witness, who
subjoined with her own hand the attestation clause now appearing upon each,
copying said attestation clauses from a form in the handwriting of the com-

plainant, and signed her name to each as a witness; that the complainant took the writings when thus completed; that the witness was not informed and knew nothing of their contents; that the witness and defendant then went down stairs into the parlor, and after some conversation on indifferent subjects the witness left the house."

The attestation clause prepared by the husband is in these words:

"I have written the within without dictation or control by my husband or any other person, without any promise or threat, and sign in presence of Miss Caroline Forman as witness."

Six days later the complainant procured the following paper to be signed by his wife:

"MILFORD, N. J., Sept. 16th, 1878.
"By this writing I bear witness willingly and without dictation or compulsion, in the hope alone that my husband will pardon my faults, that he has not by act or word condoned any offence committed by me in 1877, nor forgiven it; that the separation is concealed temporarily only to save me from disgrace before the world, at my desire, hoping that my husband will yet find it in his heart to forgive me.
"ALICE SUMMERBELL."

The language of this paper and that in the attestation clause leave no doubt in my mind that they were drawn by the husband after consultation with counsel, to be used, as they have been used, as a means of proving the wife's adultery.

If he had offered his wife as a witness to establish his case, she would have been promptly rejected. It does not appear why her declarations not under oath should be received with more favor, when, out of the presence of the court, the husband procures them for the express purpose of being put in evidence.

A confession procured under such circumstances cannot be regarded as the free and voluntary declaration of the wife, but must be treated as the product of his restraining influence exerted over her feebler will. It was penned by the hand of the wife, but is none the less the language and voice of the husband.

The attestation clause by which the complainant sought to

remove the presumption of constraint which he knew must attach to it, only adds to the suspicion with which it must be received.

The analogies of the law lead us to discredit and discard all testimony which is marked by this infirmity. A confession procured from an accused through inducements held out to him is utterly rejected as evidence. No responsibility attaches for an act done under duress. Even in certain crimes committed by the wife in presence of her husband, the law does not charge her with the guilt of the offence, but imputes her conduct to his coercion.

If these ancient principles of the law are wisely founded, what probative force should be given to the wife's confession of guilt put forth at a time and place appointed by the husband; before a witness summoned by him, attested by a clause drawn by his hand, and written and signed in his presence and under his eye, with the purpose of using it against her?

In my judgment, self-accusation thus procured is unworthy of credit, and cannot be a safe basis upon which to build up and support a charge of adultery against a wife.

But if this confession is not absolutely discarded there is an absence of such corroboration *aliunde* as should lead the judicial mind, in a matter of such vital importance to the family relation, to accept it as true.

The first charge in the bill is that the defendant committed adultery with Dr. Helm, at Peru, Indiana, in July, August, September and October, 1877, at the house of her sister.

Since the birth of her child in 1873 she had been affected with inflammation of the neck of the uterus, which had become chronic. The doctor says his treatment consisted in applying powerful solutions of iodine and carbolic acid to the inflamed parts, and that a pessary was applied to restore the uterus to its normal position by constant pressure.

That the womb trouble was real and not assumed is evinced by the fact that after the defendant's return home in June, 1877, the complainant wrote a letter to Dr. Helm, requesting a statement of the line of treatment he proposed to pursue.

Doctor Helm further asserts that sexual intercourse would have been disagreeable to her, and difficult, if not impossible, on his part.

He swears unequivocally that the charge of illicit connection with him is absolutely false, and that he never acted towards her with the slightest impropriety.

There is no evidence to show that he visited her at unusual hours, or with undue frequency, or that he was at any time alone in the house with her, so that he would have been safe from interruption, or that he ever treated her with familiarity or the least indelicacy  He is shown to be man of high professional standing and irreproachable character in the community where he has an extensive and lucrative practice.

His sworn testimony, unimpeached as it is by a single circumstance of well-grounded suspicion against him, leaves the case without the slightest corroboration so far as adultery is charged with him.

The statement in the confession of the connection with Dr. Helm is thus:

"One time after doctoring, when he said 'lay still a moment, I won't hurt you or harm you,' and I protesting and asking him to go away, I thought he did, but after he had gone I found he had done as he wished. I half-way gave up after that several times."

That Dr. Helm, who then weighed over two hundred and thirty pounds, could have had connection with her without her knowledge until he left her is simply incredible.    That he could have desired sexual intercourse with a woman in her condition is equally unworthy of belief.

A man occupying his position in public estimation is not to have his character, won by a life of correct and honorable deportment, blasted by such testimony.

I regard this part of the charge as thoroughly refuted. · False in this respect, the entire confession must fall, for the charge against Reed is emphatically denied by him under oath, and is equally without evidence to support it.

It is strenuously urged on the part of the complainant that the

letters of the wife written subsequent to the confession furnish the requisite corroboration.

If these letters admitted the adultery, they would be but the repetition of a confession made under the presumption of coercion, after the wife is removed from the presence of the husband. There would still be an absence of that support to the confession, by facts or circumstances *aliunde*, essential to the complainant's case, to justify a decree in his behalf.

But I am unable in all this correspondence to find anything that can with any certainty be construed as an admission of her guilt. In themselves the letters contain no such admission, and if the prior confession is rejected, they give no support to the complainant. It is only by giving effect to the prior confession and reading the letters in connection with it, that an inference unfavorable to the defendant is drawn.

In her after-letters she begs for forgiveness from her husband and shows great anguish of mind, but to account for this it is not necessary to adopt the hypothesis that she had been guilty of adultery.

In a letter written to the complainant April 23d, 1877, by William A. Bell, the defendant's brother, the latter says :

"You owe it to yourself as much as to Alice to correct at once and forever the abuses complained of, and as this is entirely within your power, I do not see why you cannot give her assurances that will be satisfactory. A separation would be a calamity and a disgrace to both, and to Carl the misfortune is simply indescribable."

It is apparent in the case that the wife had charged the husband with neglecting and ill-treating her, and that she had communicated her complaints to her relatives in Indiana. This resulted so seriously that a separation was threatened.

The complainant became so incensed at what he conceived to be undue interference by her relatives, that he attributed to her sister, Mrs. Reed, all his domestic troubles. His jealousy was also aroused by D. T. McNeil, the widower brother-in-law of his wife, and by one T. C. Phillips, who lived in the west. In a letter to his wife dated September 28th, 1878, he charges that

McNeil was her lover, that she had received too much attention from him, and that on one occasion in complainant's presence she had permitted McNeil to put his arm around her and kiss her, and that when he told her of the impropriety of this conduct, she charged him with being over-particular.

The case clearly shows that the wife had complained to the husband of his treatment of her, that he had made a counter charge of unwifely conduct against her, that there had been bickerings between them, and that their mutual altercations had led to the apprehension of a separation long before the charge of adultery contained in the bill was thought of.

In a letter written in April, 1878, the complainant speaks of the weakness of defendant's mind at that time, a weakness doubtless incident to the chronic disorder which had so long afflicted her body. In such condition she was easily controlled by his superior will, and he could readily have impressed her with an exaggerated sense of her wrong-doing, and magnified her faults or slight indiscretions in her own eyes. When, therefore, she received the first two letters from him, written after the confession, in the last days of September, from Kokomo, containing no expressions of affection, and commencing with "Mrs. Summerbell," indicating too plainly that her husband had become estranged from her, is it surprising that she, to avert the threatened breach, was quick to acknowledge herself in the wrong and to sue for forgiveness?

Is it necessary, under such circumstances, to attribute the distress of mind disclosed by the utterances of a feeble woman to consciousness of criminal misconduct? Paroxysms of grief have been exhibited by women for far less cause than that which was present to move her, assuming that her chastity is unimpeached.

In her reply to these letters, written by her from Milford, N. J., October 1st, 1878, she addresses her husband as "Dear Joseph," and says:

"Yesterday I received your second letter from K. I got the little one on Saturday, and the 'Mrs. Summerbell' stunned me so, I read it twenty times before I began to see a glimmer of light, and then I thought it is written after another letter, but I did not see through either. Have you decided that you

will not see me again or live with me? Joseph, what has changed you so since you left me? You were so good and kind, you made me love you again so much better than ever, and now you turn my blood with your formality."

In the same letter she says :

"Joseph, let me see you again. Do not decide yet, please. Joseph, you speak of asking too hard terms, of its appearing selfish, that there will be only future misery. Oh, Joseph, that cannot be; I will never complain again or think I have poverty, no matter how many reverses you may have. Try me, try me."

Thus, after pouring out her heart to her husband, and asking him to forgive her, to what did she refer as the cause of this estrangement, and in what did she promise to amend her conduct?

In nothing save to abstain from future complaints to her family, or to him, of his treatment of her, with the assurance that she would be content with her lot in the sphere in which he had placed her. Is this the language in which a wife sensible of adulterous conduct would have addressed a husband who believed in her guilt?

Why should she be so greatly stunned by the coldness of a husband, if she thought he believed that she had so repeatedly surrendered her person to the embraces of other men?

How, under such circumstances and with such a conviction, could he, before he left her and after the confession, have been so good and kind, and made her love him again so much better than ever?

If she had been guilty of adultery she must have been sensible that the mere promise of reform in a matter comparatively so trivial as her complaints of him, would have served only to incense him.

There is an extraordinary feature which marks this confession of September 10th, that impels me to exact from the husband corroboration for it of a far higher character than that drawn by mere construction from the letters, while they are susceptible of a more charitable interpretation.

The confession commences thus :

"My husband, it is with a heart full of anguish and sorrow and remorse that I write this confession."

Yet on the morning of September 10th she greeted pleasantly the lady who she knew had come to be a witness to a declaration which would, if published and credited, consign her to infamy. Without displaying a trace of agitation she penned it down, and signing it handed it to her husband as if it were a mere business paper, and then unconcernedly went down stairs into the parlor with the subscribing witness, conversing upon indifferent topics.

Amazing indifference in a woman not steeped in vice and lost to sense of shame!

That there must have been some understanding between the husband and wife as to the disposition to be made of this paper, and the motives which prompted her to execute it, which has not been revealed to us, their conduct fully persuades me.

The renewal of endearments between them immediately after the confession, as stated so naturally in her letter of October 1st, which I doubt not took place, is inconsistent with his belief in her guilt. That there was an apparent reconciliation is not an unwarrantable inference from the haste with which he procured the non-condonation paper from her before condonation had been suggested by any one.

Again, with the wife's written confession in his pocket, he never, either in his letters to her or in his subsequent intercourse with her brothers, expressed the slightest indignation for the baseness of Helm and Reed, in betraying the confidence reposed in the one as a physician and in the other as a brother-in-law.

His anger was aroused, and he gives vent to it only against McNeil and Phillips, in his letters of September 28th and 30th, 1878.

In the latter letter he gives expression to the conviction that his wife had improper connection with Phillips, although she denied it, and there is no evidence to support the imputation. Phillips was a paralytic, so far enfeebled by his disease that he died in July, 1878, from the effects of it. The tone of these letters leads to the inference that he distrusted both her charge

against Helm and Reed, and her denial as to McNeil and Phillips.

It is quite as difficult to reconcile many circumstances in this case with a belief in the guilt of Helm and Reed, as it is to explain expressions in her letters consistently with her innocence.

To grant the complainant's prayer as this case stands, the evidence consisting only of unsworn statements of the wife, the truth of which she now stoutly denies, would be to declare that two men of hitherto unblemished repute have been guilty of a criminal act, without a word of testimony under oath to prove the *delictum,* and without a word or an act on their part that justly gives color to the accusation.

I know of no instance in which a divorce has been granted under such circumstances.

In my opinion, the complainant has failed to present the requisite measure of proof to substantiate the allegations in his bill, and the decree below denying the divorce should be affirmed, with costs.

Since the filing of this bill there has been a change in the law of evidence, which makes the husband and wife competent witnesses in divorce suits. Therefore, under the circumstances of this case, by the unanimous vote of the court, the dismissal of the bill will be without prejudice to the filing of a new bill.

For affirmance—DIXON, KNAPP, PARKER, SCUDDER, VAN SYCKEL, CLEMENT, GREEN, PATERSON—8.

For reversal—CHIEF JUSTICE, DEPUE, MAGIE, REED, COLE, KIRK, WHITAKER—7.